Entered on Docket December 27, 2011

**Below is a Memorandum Decision of the Court.**



**Marc Barreca**
**U.S. Bankruptcy Court Judge**
**(Dated as of Entered on Docket date above)**

MARC BARRECA
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Rm. 6301
Seattle, WA 98101
(206) 370-5310

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re<br><br>Robert S. Blenheim and<br>Darlene G. Blendheim,<br><br>Debtors. | Chapter 13<br><br>Bankruptcy No. 09-10283-MLB<br><br>**MEMORANDUM OPINION DENYING CONFIRMATION OF DEBTORS' CHAPTER 13 PLAN DATED OCTOBER 15, 2011** |

This matter came before the Court on Debtors' Motion to Confirm Amended Plan (*see* Dkt. Nos. 140, 155, 156, and 170), in which Debtors seek confirmation of their ninth amended Chapter 13 Plan, dated October 15, 2011 (the "Plan").[1] The Chapter 13 Trustee (the "Trustee") opposes confirmation of the Plan alleging that (1) the amended plan fails to

[1] Unless otherwise noted, all docket references herein are made to *In re Blendheim*, 09-10283-MLB (Bankr. W.D. Wash. filed Jan. 15, 2009).

provide for the liquidation value of the estate, and (2) the Plan is not feasible given Debtors' income. *See* Dkt. No. 158. Litton Loan Servicing L.P. ("Litton")[2] opposes confirmation of the Plan alleging that: (1) Debtors improperly seek to cancel and void Litton's lien upon completion of the Plan, and (2) the Plan was not filed in good faith. *See* Dkt. Nos. 148 and 167. On November 23, 2011, the Court held a confirmation hearing at which evidence was presented, and subsequently took this matter under advisement.

**FACTS**

**Background**

On May 17, 2007, Debtors filed for bankruptcy under Chapter 7[3] of the Code.[4] Debtors received their Chapter 7 discharge on January 14, 2009, and the case was closed on November 4, 2010.

On January 15, 2009, the day following their discharge in their Chapter 7 case, Debtors filed a second bankruptcy under Chapter 13 of the Code - initiating a so-called "Chapter 20" case. Given that Debtors' unsecured debts had been discharged in their Chapter 7 case, the Chapter 13 was filed to deal with Debtors' secured debts relating to their primary residence, a condominium located at 3717 Beach Drive SW, No. 315, Seattle,

---

[2] As explained more fully below, Litton Loan Servicing L.P. may have been the servicer with regard to *both* the First Position and Second Position Liens on Debtors' Residence. However, Litton appeared in the main case and related adversary proceeding only with regard to the First Position Lien. Litton recently transferred servicing regarding the First Position Lien to Ocwen Loan Servicing, LLC ("Ocwen"). The owner of the loan remains the same. Although the Plan objections are currently being prosecuted by Ocwen, the Court will refer to "Litton" for simplicity since Litton was the servicer in place for the majority of events relevant to this Plan.

[3] *In re Blendheim* , 07-12263-MLB (Bankr. W.D. Wash. filed May 17, 2007) (assigned to Judge Karen A. Overstreet at all relevant times).

[4] All references to "Code" and "Section" herein refer to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Washington (the "Residence"). Post-filing, Debtors also discovered a dispute with Harbor West Condo Association ("Harbor West") regarding a lien against their Residence due to unpaid pre-petition homeowners' association dues and other obligations.

Harbor West Claim

On March 11, 2009, Harbor West filed a secured claim in the amount of $28,917.44, amended on May 26, 2010 to $17,924.20, and indicating that ongoing assessments were accruing at the rate of $527.00 per month. *See* Claim Nos. 2-1 and 2-2. Although the details surrounding Harbor West's claim are somewhat complicated, all outstanding disputes between Debtor and Harbor West were resolved pursuant to an order for adequate protection, dated November 4, 2009 (the "Harbor West Adequate Protection Order"), and a stipulated order on Debtors' objection to Harbor West's claim (the "Harbor West Stipulated Order"), dated January 10, 2011. *See* Dkt. Nos. 69 and 114.

Secured Mortgage Claims

On January 28, 2009, Litton, as servicing agent for HSBC Bank USA National Association as Indenture Trustee of the Fieldstone Mortgage Investment Trust Series 2006-1, filed a proof of claim in the amount of $419,498.75, secured by a first position deed of trust on Debtors' Residence (the "First Position Lien"). *See* Claim No. 1. When Debtors subsequently filed their schedules, they valued their Residence at $402,000.00 on Schedule A, and scheduled the First Position Lien as disputed and contingent in the amount of $419,498.75. Dkt. No. 16. Although incorrectly scheduled, Debtors also acknowledged a second position lien on their Residence (the "Second Position Lien"). *Id.* HSBC Mortgage Services was acknowledged to have a claim in the amount of $90,474.02, secured by the Second Position Lien, but was scheduled as having a disputed, contingent "[w]holly unsecured claim due to senior lien exceeding value of property." *See id.* On October 16, 2009, Debtors filed an Amended Schedule A, valuing their Residence at $328,000, subject to $459,416.19 of encumbrances. Dkt. No. 48.

Claim Objection Regarding First Position Lien

On October 9, 2009, Debtors filed an Objection to Claim No. 1 of Litton Loan

Servicing (the "Claim Objection re First Position Lien") on the basis that Litton's proof of claim was not supported by sufficient evidence. Dkt. No. 44. Although Litton had attached a copy of the relevant deed of trust to its proof of claim, Litton had failed to attach a copy of the promissory note. Moreover, Debtors alleged that a copy of the note previously provided to them by Litton pursuant to a Qualified Written Request contained a forgery of Mr. Blendheim's signature. The response deadline for the Claim Objection re First Position Lien was November 6, 2009.

Prior to the response deadline, on October 27, 2009, Litton, through its then counsel James MaGee, filed a motion (mis)titled "Motion for Adequate Protection Disbursements, HSBC Bank USA Noteholder," (the "Motion for Adequate Protection") which requested an order terminating the automatic stay. Dkt. No. 53. Litton concurrently filed copies of the promissory note, first deed of trust, and assignment of first deed of trust. Dkt. Nos. 54-56. Litton did not file a response to the Claim Objection re First Position Lien.

On November 18, 2009, in the absence of any filed objections, Judge Overstreet entered an order sustaining the Claim Objection re First Position Lien (the "Order Sustaining Claim Objection re First Position Lien"). *See* Dkt. Nos. 70-71, 74. Debtors served Litton and its counsel with a copy of the Order Sustaining Claim Objection re First Position Lien. Dkt. No. 76.

Thereafter Debtors filed a response to Litton's Motion for Adequate Protection, which referenced their Claim Objection re First Position Lien and the fact that an order had been entered disallowing Litton's claim. *See* Dkt. No. 77. A few days later, on December 15, 2009, Litton's counsel filed a Notice to Court Motion [for Adequate Protection] Withdrawn, Hearing Stricken and a Request for No Future Electronic Notice.

<u>Transfer of Case</u>

On July 13, 2010, the above-captioned case (09-10283) and the related adversary proceeding (10-01203) were transferred from Judge Karen A. Overstreet to this Court.

<u>Motion to Set Aside Order Disallowing Litton's Claim re First Position Lien</u>

On April 5, 2011, Litton, through then counsel Mark Moburg, filed a motion to set

aside Judge Overstreet's Order Sustaining Claim Objection re First Position Lien - alleging mistake, inadvertence, surprise, excusable neglect, various due process issues, and inadequate service. Dkt. No. 115. Following a contested hearing, this Court declined to set aside Judge Overstreet's Order Sustaining Claim Objection re First Position Lien. Dkt. No. 121. This Court's order is currently on appeal. *See* Dkt. No. 143.

Adversary Proceeding to Avoid Litton's First Position Lien

On April 28, 2010, Debtors filed an adversary proceeding, *Blendheim v. Note Holder*, 10-01203-MLB, seeking to void the First Position Lien or to declare it unenforceable based on the First Position Lien claim having been disallowed, and for damages. On August 19, 2011, the Court granted Debtor-Plaintiff's renewed Motion for Summary Judgment, and voided and cancelled the First Position Lien pursuant to Section 506(d) (the "Order Voiding First Position Lien"). *See* Dkt. No. 43 in 10-01203-MLB. The Order Voiding First Position Lien is currently on appeal. *See* Dkt. No. 51 in 10-01203-MLB.

Motion to Avoid the Second Position Lien

One week after filing the Claim Objection re First Position Lien, on October 16, 2009 Debtors filed a motion to avoid the Second Position Lien, alleging that it was wholly unsecured and could be "stripped off" pursuant to § 506(a). Dkt. No. 49. The response deadline was November 12, 2009, but no response was filed. On November 19, 2009, one day after entering the Order Sustaining Claim Objection re First Position Lien, in the absence of any filed objections, Judge Overstreet entered an Order Avoiding Wholly Unsecured Junior Mortgage (the "Order Stripping Second Position Lien"). *See* Dkt. Nos. 72-73, 75. The Order Stripping Second Position Lien disallowed HSBC Mortgage Services' secured claim, allowed HSBC Mortgage Services an unsecured claim of $90,474.02, and declared that HSBC Mortgage Services' lien was void.

**Debtor's Ninth Amended Plan**

Debtors Plan, dated October 15, 2011, indicates that Debtors are below median income and not eligible for a discharge. The Plan provides for payments to the Trustee of

$2001 per month for a term of 36 months, and notes that the term may be extended up to 60 months if necessary. Harbor West is to receive payment of $195 per month toward payment of pre-petition arrears on homeowners' association dues "inside" the Plan, and is to receive $550 per month (or the amount set by Harbor West) for ongoing homeowners' association dues "outside" the Plan. The Plan further notes that:

> Nothing in this Plan modifies the terms of the Order For Adequate Protection Re: Harbor West Condominium Association entered on November 4, 2009 (Dockt. #69) or the Stipulated Order on Claim of Secured Creditor Harbor West Condominium Association entered January 10, 2011 (Dockt. #114) both of which are incorporated into this Plan.

Allowed unsecured claims are to receive $0 under the Plan.

The Plan does not provide for the First Position or Second Position Lien holders as secured or unsecured creditors, and includes a notation in the "Special Intention" section:

> Pursuant to Court's Ruling in Adversary Case # 10-01203, Dockt. # 41, an adversary where both Creditor HSBC and Creditor Litton Loan Servicing Appeared, is incorporated herein by reference, and holds that upon Plan Completion, the Deed of Trust, set forth as follows is void and cancelled. The subject Deed of Trust was recorded on December 15, 2005, in King County, Washington under recording number 20051215002809, on Debtor's residential real estate at 3717 Beach Drive SW #315,Seattle, Washington 98116, with the following legal description:
>
> [Legal Description].
>
> HSBC Mortgage Services and/ or Litton Loan Servicing May also be Creditors relating to a Deed of Trust alleged to have been a second mortgage against Debtors' residence. That mortgage was void as wholly unsecured through motion and court order entered November, 19, 2009, Dockt. #75. Upon completion of this Plan, it shall be deemed void and cancelled.

**Objections to Debtor's Ninth Amended Plan**

The Trustee opposes confirmation of the Plan, alleging that (1) the amended Plan fails to provide for the liquidation value of the estate, and (2) the Plan is "not feasible" given Debtors' income. *See* Dkt. No. 158. The Trustee alleges that since the Residence is now entirely unencumbered, Debtors are required to pay HSBC Mortgage Service's $90,474.02 unsecured claim, created pursuant to the Order Stripping Second Position Lien, in full, because the liquidation value of the estate substantially exceeds the amount of HSBC

Mortgage Services' claim. The Trustee calculates that assuming the value of the Residence is $328,000, the liquidation value is $276,485.71. Even if Debtors amended their exemption election to claim a $125,000 Washington state homestead exemption, the liquidation value would be $157,438.10. Thus, the Trustee contends that Debtors are required to pay the full amount of HSBC's claim. Furthermore, the Trustee alleges that since the proposed Plan payment of $2001 per month is insufficient to pay HSBC's claim in full during the life of the Plan, and Debtors' net income as set forth in the record shows them incapable of paying HSBC's claim in full over the life of the Plan, the Plan is not feasible. At the confirmation hearing the Trustee further alleged that it was bad faith for Debtors to both strip the Second Position Lien based on value and void the First Position Lien based on claim disallowance, yet fail to provide for payment of the Second Position Lien holder's $90,474.02 unsecured claim.

Litton joins the Trustee's objections and opposes confirmation of the Plan ,alleging that: (1) Debtors improperly seek to cancel and void Litton's First Position Lien upon completion of the Plan, and (2) this ninth Plan is not filed in good faith. *See* Dkt. Nos. 148 and 167. Litton argues that a lien cannot be avoided upon plan "completion." In other words, a debtor must be eligible for a discharge to avoid a lien in Chapter 13; plan "completion" is not a recognized mechanism for avoiding a lien. Litton also argues that Debtors filed the Chapter 13 case in bad faith, as they filed the case during the pendency of their Chapter 7 case the day before a foreclosure sale of their Residence. Finally, Litton argues that in obtaining both the Order Stripping Second Position Lien and Order Sustaining Claim Objection re First Position Lien, and ultimately obtaining the Order Voiding First Position Lien, Debtors articulated inconsistent, mutually exclusive stories to the Court - constituting bad faith.

> The Blendheims . . . obtained a ruling from this Court that stripped-off a junior lien based on their representation that [Litton] possessed a senior lien that exceeded the value of the property. But while making that representation, the Blendheims also filed an objection asserting [Litton's] claim should be disallowed and later obtained an order avoiding [Litton's senior] lien. The Blendheims now seek confirmation of a plan that provides both liens will be voided and cancelled upon

> completion of proposed plan payments. In sum, the Blendheims represented to the Court [that Litton's] lien is valid when it suits one purpose, and contended [Litton's] lien is invalid to suit another.

Dkt. No. 167. Notably, although Litton Loan Servicing was apparently the loan servicer regarding both the First Position and Second Position Liens, it appeared only regarding the First Position Lien in this case and in the related adversary proceeding. No appearance was entered on behalf of the Second Position Lien holder.

## ANALYSIS

As explained more fully below, Debtors' Plan is not confirmable. Although this Court does not recognize any inherent barrier to lien stripping in a Chapter 20 case, it is essential that any plan proposing such lien stripping otherwise comply with the traditional requirements for Chapter 13 confirmation. Debtors' Plan fails primarily because it was not proposed in good faith. The Plan inequitably proposes to take advantage of the Order Sustaining Claim Objection re First Position Lien - disallowing the First Position Lien claim, the Order Voiding First Position Lien, and the Order Stripping Second Position Lien based on value. Such "double-dipping" is inequitable and constitutes an unfair manipulation of the Code. Further, the Plan does not devote all of Debtors' available income to the Plan and does not satisfy the best interests of creditors test.

### A. Ability to Lien Strip in a Chapter 20 Case

Notwithstanding a split of authority between lower courts within the Ninth Circuit, this Court concludes that a debtor need not be eligible for a Chapter 13 discharge to file a Chapter 13 plan that proposes to strip a wholly unsecured lien from a debtor's residence. The reasoning set forth in *In re Tran,* 431 B.R. 230, 235 (Bankr. N.D. Cal. 2010), is persuasive:

> [T]he Bankruptcy Code does not condition a chapter 13 debtor's right to strip off a wholly unsecured junior lien on the debtor's eligibility for a discharge. Rather, such right is conditioned on the debtor's obtaining confirmation of, and performing under, a chapter 13 plan that meets all of the statutory requirements .

*Accord In re Hill*, 440 B.R. 176, 182 (Bankr. S. D. Cal. 2010) ("[L]ien strips are permitted in Chapter 20 cases even without a discharge."); *In re Okosisi*, 451 B.R. 90, 100 (Bankr. D. Nev. 2011) ("[C]hapter 20 bankruptcy is permissible under the Code, and [debtors] may take advantage of all available chapter 13 restructuring tools," including lien stripping.); *Fisette v. Keller*, 455 B.R. 177, 185 (8th Cir. B.A.P 2011) ("We hold that the strip off of a wholly unsecured lien on a debtor's principal residence . . . is not contingent on his receipt of a Chapter 13 discharge").[5] Notably, in order to be confirmed any Chapter 20 plan proposing to strip a lien must otherwise comply with all other requirements for plan confirmation set forth in the Code. *See e.g. Tran*, 431 B.R. at 235 (permitting Chapter 20 lien stripping but requiring plan that otherwise "meets all of the statutory requirements"); *Hill*, 440 B.R. at 182 (permitting Chapter 20 lien stripping but requiring plan that "otherwise complies with the requirements of the Code"). "Once the lien is so avoided, the unsecured claim that is represented by this nonrecourse debt becomes an unsecured claim in the bankruptcy." *Okosisi*, 451 B.R. at 96. As the holder of an unsecured claim, the creditor whose lien was stripped "need only be paid its pro-rata share of Debtors' disposable income calculated under 707(b) and its pro-rata share of any equity in Debtors' assets." *Hill*, 440 B.R. at 183.

The lien avoidance will become permanent not upon a discharge, as would happen in a typical Chapter 13 case, but upon *completion of all payments* as required by the plan. As set forth in *Okosisi*,

> At the successful completion of all payments in a no-discharge chapter 13 case, no order discharging the debtor will be entered because the debtor is not eligible for a discharge. 11 U.S.C. § 1328(f). . . . [I]n this situation, the proper result is for the court to close the case without discharge. . . . Because the no-discharge case is closed without discharge, rather than dismissed, the code sections that reverse any lien avoidance actions contained within a chapter 13 plan upon conversion or dismissal are not implicated, and, thus, do not act to prevent the permanence of the lien

---

[5] For contrary authority, see *In re Winitzky*, 2009 Bankr. LEXIS 2430, at *9 (Bankr. C.D. Cal. 2009) (A Chapter 20 "lien strip would allow a debtor to simply do indirectly what the Supreme Court [in *Dewsnup*] has ruled he may not do directly.""); *In re Victorio*, 454 B.R. 759, 761 (Bankr. S. D. Cal. 2011) (concluding that the ability to receive a discharge is a prerequisite to obtaining a permanent lien strip).

> avoidance. . . . Once a debtor successfully complete all plan payments required by a chapter 13 plan, the provisions of the plan become permanent, and the lien avoidance is, similarly permanent.

451 B.R. at 99-100 (noting that although, per *In re Leavitt,*, 171 F.3d 1219, 1223 (9th Cir. 1999), a Chapter 13 case can only end in one of three ways: conversion, dismissal, or discharge, BAPCPA's addition of § 1328(f) "opened up the possibility of a fourth option, the completion of all plan payments without a discharge"); *accord Fisette* 455 B.R. at 185 ("We hold that the strip off of a wholly unsecured lien on a debtor's principal residence is effective upon completion of the debtor's obligations under his plan."); *contra In re Victorio*, 454 B.R. 759, 761 (Banrk. S. D. Cal. 2011) ("[D]ebtors in a Chapter 20 case cannot obtain a "permanent" avoidance of a wholly unsecured junior lien on their principal residence unless they pay the claim amount in full, or obtain a discharge.").

This Court concludes that it is not per se prohibited for Debtors to propose a Chapter 13 plan stripping the First or Second Position Lien on their Residence, notwithstanding their lack of eligibility for a Chapter 13 discharge.

## B. Good Faith

To confirm a plan, the Court must find that the case was filed in good faith and that the plan has been proposed in good faith and not by any means forbidden by law.[6] 11 U.S.C. § 1325(a)(3), (a)(7). "Good faith in the Chapter 13 context is to be determined on a case by case basis, after an examination of the totality of the circumstances." *Okosisi*, 451 B.R. at 101 (referencing *In re Warren*, 89 B.R 87, 93 (9th Cir. B.A.P. 1988)). The "Court has an independent duty to review the issue of good faith under § 1325(a)(3)." *See e.g.*, *Hill*, 440 B.R. at 184.

In determining whether a plan is filed in bad faith, a "bankruptcy court must inquire whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy

---

[6] Although none of the objecting parties specifically cited 1325(a)(7), many of the arguments in the pleadings and much of the argument at the confirmation hearing alleged that Debtors' Chapter 13 petition, commencing their Chapter 20 case, was filed in bad faith.

Code, or otherwise proposed his Chapter 13 plan in an inequitable manner." *Warren,* 89 B.R. at 90-91.

> While it is not practical to provide a list of all relevant considerations . . . a number of specific factors have been adopted as guidelines for determining good faith on a case-by-case basis: (1) The amount of the proposed payments and the amounts of the debtor's surplus; (2) The debtor's employment history, ability to earn, and likelihood of future increases in income; (3) The probable or expected duration of the plan; (4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court; (5) The extent of preferential treatment between classes of creditors; (6) The extent to which secured claims are modified; (7) The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7, (8) The existence of special circumstances such as inordinate medical expenses; (9) The frequency with which the debtor has sought relief under the [Code]; (10) The motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) The burden which the plan's administration would place upon the trustee.

*Id.* at 92-93.[7] The "debtor has the burden of establishing good faith." *Id.* at 93.

In the context of Chapter 20 lien strip cases, courts in the Ninth Circuit have articulated and focused on the following four factors: (1) whether debtors have a need for bankruptcy other than to do a lien strip, (2) whether the debtors acted equitably in proposing a plan, (3) whether the debtors are insolvent and are devoting all of their income to the plan, and (4) whether the debtors used serial filings to avoid payment to creditors. *See Hill,* 440 B.R. at 184-85 (applying the "germane" *Warren* factors); *Okosisi*, 451 B.R. at 101-103 (finding the *Warren* factors instructive and applying the same factors as *Hill*); *c.f. In re Tran*, 431 B.R. at 237 (citing *Warren*). However, because lower courts within the Ninth Circuit

---

[7] Notwithstanding the Bankruptcy Appellate Panel of the Ninth Circuit's suggestion that the *Warren* factors have been superseded by amendments to the Bankruptcy Code, this Court finds that some of the *Warren* factors are still relevant in determining whether a plan has been filed in good faith. *See Penland v. Rakozy*, 2006 Bankr. LEXIS 4838, at *14-16 (9th Cir. B.A.P. 2006) (unpublished) ("Because so many of the *Warren* factors have been subsumed into § 1325(b), the factors identified in *Leavitt* should control a § 1325(a)(3) good faith analysis."). Many of the *Warren* factors have indeed been expressly incorporated into Section § 1325(b), but that does not necessarily render the remaining factors irrelevant in determining whether a plan has been filed in good faith.

have been inconsistent as to what "good faith" standard should apply in making a § 1325(a)(3) determination,[8] the Court also evaluates Debtors' Plan under the "bad faith" factors identified in *Leavitt v. Soto*:

> (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his Chapter 13 petition or plan in an inequitable manner . . . ; (2) the debtor's history of filings and dismissals . . . ; (3) whether the debtor only intended to defeat state court litigation . . . ; and (4) whether egregious behavior is present.

171 F.3d 1219, 1224 (9th Cir. 1999) (internal marks omitted) (articulating factors for determining whether a Chapter 13 case should be dismissed for bad faith).

1. <u>A Need for Bankruptcy Other Than Lien Avoidance</u>

In *Tran,* the Court suggested that filing a Chapter 20 case "solely for purposes of avoiding the second deed of trust . . . where no independent reason exists for [the] subsequent chapter 13 filing" was an unfair manipulation of the bankruptcy Code. 431 B.R. at 237 (noting the small amount of arrears on the first mortgage, the absence of tax debts or other pre-petition priority claims, and the debtor's balance sheet solvency). However, in *Okosisi* and *Hill* the Court found no bad faith where the debtors otherwise had a "valid bankruptcy purpose" or "valid reorganization goals" aside from lien stripping, and the proposed plan dealt with those other issues. *See Okosisi*, 451 B.R. at 102 (concluding that dealing with debtors' insolvency, arrearage on the primary residence, priority claims (federal and state

---

[8] Compare *Hill* and *Okosisi*, cited above, with *Mead v. Loheit*, 2010 Bankr. LEXIS 5104 at *16-20 (9th Cir. B.A.P. 2010) (unpublished) (citing *Goeb v. Heid*, 674 F.2d 1386 (9th Cir. 1982) as the seminal case on good faith under 1325(a)(3), referencing *Leavitt,* cautioning against using a "laundry list" of factors, and applying the "totality of the circumstances"); *Rocco v. King*, 2008 Bankr. LEXIS 4727, at *5, *9-11 (9th Cir. B.A.P. 2008) (unpublished) (noting that the bankruptcy court had considered "each of the eleven good faith factors announced in *Warren*, as well as the four factors announced in *Leavitt*", but finding that the *Leavitt* factors control) (internal citations omitted); *Kinder v. Billinslea*, 2006 Bankr. LEXIS 4853 at *11-15 (9th Cir. B.A.P. 2006) (unpublished) (citing *Warren*, *Leavitt,* and *Goeb* as instructive on the issue of good faith); *Penland v. Rakozy*, 2006 Bankr. LEXIS 4838, at *14-16 (9th Cir. B.A.P. 2006) (unpublished) (suggesting the *Warren* factors have been superseded by statute and that *Leavitt* controls).

taxes), and ongoing auto payments, in addition to lien stripping, constituted a "valid bankruptcy purpose"); *Hill*, 440 B.R. at 184 (concluding that dealing with debtors' insolvency, unemployment, non-dischargeable student loans, arrearage on the senior lien on their residence, and secured property taxes, in addition to lien stripping, constituted "valid reorganization goals").

Here, in filing their Chapter 20 case and in proposing their Plan, Debtors have valid reorganization goals other than lien stripping. Debtors filed the Chapter 13 case in good faith, not only to strip the Second Position Lien, but also to deal with fraud claims and other issues surrounding their First Position Lien. The Plan as proposed also repays a secured debt owed to Harbor West for past-due homeowners association dues and other obligations, and clarifies that ongoing post-petition dues will be paid outside the Plan.

2. Acting Equitably in Proposing the Plan / Unfair Manipulation of the Code / Egregious Behavior

In *Okosisi*, the Court found that the debtors had acted equitably in proposing their plan where there was significant repayment to creditors over the plan term (over $43,000) and the debtors otherwise had valid reorganization purposes and good intentions. 451 B.R. at 102. In *Hill,* the Court found the debtors had acted equitably in proposing the plan where the debtors had good intentions in filing the Chapter 20 case, were sincere, and had otherwise complied with their responsibilities under the Code. 440 B.R. at 184.

Here, the Court cannot find that Debtors acted equitably in proposing their Plan. Debtors filed the Claim Objection re First Position Lien and Motion to Avoid the Second Position Lien within a week of each other. On November 18, 2009, Judge Overstreet entered the Order Sustaining the Claim Objection re First Position Lien, which wholly disallowed the First Position Lien claim. The following day, on November 19, 2009, *relying on Debtors' representations that the Second Position Lien was wholly unsecured and junior to the fully secured First Position Lien,* Judge Overstreet entered the Order Stripping Second Position Lien. However, at the time the Order Stripping Second Position Lien was entered, the factual

predicates underpinning the Motion to Avoid Second Position Lien were no longer true. The Second Position Lien was no longer junior, nor was it wholly unsecured. Rather, the Second Position Lien was fully *secured.* Had the true facts been made known to Judge Overstreet, she would not have signed the Order Stripping Second Position Lien.

Although Debtors' intent in having both the Claim Objection re First Position Lien and Motion to Avoid the Second Position Lien simultaneously pending before Judge Overstreet could be debated, it is beyond question that Debtors should not have submitted the Order Stripping Second Position Lien for Judge Overstreet's signature. Alternatively, Debtors should have withdrawn the Order Stripping Second Position Lien as soon as they obtained the Order Sustaining Claim Objection re First Position Lien, or promptly moved to have one of the two orders vacated. Notwithstanding that the Motion to Avoid Second Position Lien was unopposed, Debtors had a duty of candor to the Court. It was inequitable and not in good faith for Debtors to retain the signed Order Stripping Second Position Lien given the circumstances.

In the instant Plan Debtors propose to "have their cake and eat it too," by incorporating the Order Voiding First Position Lien, and yet based on the amount and priority of that First Position Lien, also stripping the Second Position Lien upon completion of the Plan. Although this Court believes that the *case* was filed in good faith, this *Plan* does not pass muster. Incorporating the Order Stripping Second Position Lien into the Plan taints the Plan because the Plan proposes to preserve and utilize the inequitably obtained order. Moreover, permitting confirmation of this Plan which would ultimately void both the First Position and Second Position Liens would bestow an unwarranted windfall on the Debtors, and would be inequitable and constitute an unfair manipulation of the Code. Thus, this Plan was not proposed in good faith.

3. <u>Not Using Serial Filings to Avoid Payment to Creditors</u> / <u>Intending to Defeat State Court Litigation</u> / <u>History of Repeat Filings</u>

In *Okosisi*, the court found no bad faith as "no creditor [was] in a worse position

because of the chapter 13 bankruptcy, and some may actually be in a more favorable position if all payments are successfully made." 451 B.R. at 103. In *Hill*, the court concluded there was no bad faith because "no creditor [would] suffer worse treatment due to this Chapter 20 case," as the debtors "had less net income to devote to payment of creditors in" the Chapter 7 case than in the Chapter 13 case. 440 B.R. at 185. The creditor whose lien was stripped stood "to receive more from the combined Chapter 20 bankruptcy process than it might otherwise have received: its pro-rata share of the distribution to unsecured creditors." *Id.*

The instant Debtors have filed no bankruptcies of which the Court is aware other than the Chapter 7 and Chapter 13 cases mentioned in this memorandum opinion. They do not appear be to serial "repeat filers" systematically and regularly abusing the bankruptcy system. However, after receiving a Chapter 7 discharge in Case No. 07-12263-MLB on January 14, 2009, Debtors immediately filed the instant Chapter 13 petition on January 15, 2009, on the eve of a foreclosure sale.

Although the Chapter 13 filing appears to have been motivated by Debtors' wish to avoid the foreclosure sale of their Residence, the Court does not find that filing for Chapter 13 bankruptcy under those circumstances necessarily constitutes bad faith. Many Chapter 13 debtors file for bankruptcy on the eve of a foreclosure sale as a last resort. However, given that Debtors' Plan proposes to strip both the First and Second Position Liens on the Residence, with neither creditor receiving *any* payments under the Plan as either a secured or unsecured creditor, the Court cannot conclude that creditors are not harmed by this Plan. While not as strong a finding, this Court concludes that the Plan, as proposed, inequitably avoids payment to creditors.

**C. Best Efforts Test**

In *Okosisi,* because the debtors had no equity in any non-exempt assets, and were committing all of their disposable income (and more) to the plan, the Court found that the plan was proposed in good faith. 451 B.R. at 102-03. Similarly, in *Hill* the court found that notwithstanding the fact that the debtors' plan "generate[d] only a minimal dividend to pay

their creditors," the plan was proposed in good faith because the debtors had no non-exempt assets and were devoting "a sum greater than their disposable income" to the plan. 440 B.R. at 185. Although these Chapter 20 lien strip cases discuss devoting all of one's disposable income to a plan as a "good faith" factor (presumably borrowing from *Warren*), it is actually an independent requirement of plan confirmation pursuant to § 1325(b)(1)(B).[9]

Here, Debtors are not devoting all of their disposable income to the Plan. Debtors' proposed Plan seeks to strip both the First Position and Second Position Liens, eliminating the expense of monthly payments on both the First and Second Position Lien claims. However, Debtor's Schedule I and J show positive monthly net income of $3,514.77. Although the Order Stripping Second Position Lien awarded HSBC Mortgage Services an unsecured claim in the amount of $90,474.02, Debtors' Plan provides $0 to unsecured creditors. Thus, Debtors are not devoting all of their disposable income to the Plan as required by § 1325(b)(1)(B).

**D. Best Interests of Creditors Test**

Pursuant to § 1325(a)(4), a court may confirm a plan only if "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." This is colloquially known as the "best interests of creditors test."

> The phrase "effective date of the plan" is not defined by the Code. Without directly deciding the question, most best-interests-of-creditors test cases perform the hypothetical liquidation as of the date of the Chapter 13 petition. For other purposes such as valuation of collateral, a majority of the reported decisions conclude that the effective date of the plan means the date of confirmation.

Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, 4th Ed., § 160.1, *available at*

---

[9] This Court regards devoting all of one's disposable income to a plan as being one of the *Warren* good faith factors that has been subsumed by amendments to the Code.

www.Ch13online.com; *accord Collier on Bankruptcy* ¶ 1325.05 (Alan N. Resnick and Henry J. Sommer, eds., 16th ed.) ("[I]t is most logical to look to the property that would have been liquidated in a chapter 7 case filed on the date the chapter 13 case was filed, because it is that property that would be liquidated if the chapter 13 case were later converted to chapter 7.")

Here, in their most recent Schedules, Debtors value their Residence at $328,000. *See* Dkt. No. 48. Subtracting costs of sale of ten percent, leaves $295,000. Subtracting $90,474.02, since the stripping of the junior wholly unsecured lien would not be permitted in Chapter 7, leaves $204,725.98.[10] Debtors have not asserted a homestead exemption but, giving them the benefit of the doubt of a $125,000 Washington state homestead exemption, the non-exempt equity in their Residence would be $79,725.98. Subtracting the Harbor West date-of-petition claim balance of $28,917.44[11] and the hypothetical Chapter 7 Trustee's fees in the approximate amount of $5,790.43, leaves an approximate liquidation value of $45,018.11. Although this Court has already found that the Plan as proposed is not confirmable because it was not filed in good faith, it is notable that the Plan also fails the best interests of creditors test.

**E. Feasibility**

Debtors' Schedules I and J indicate monthly income of $5,016.27 and monthly expenses of $1,501.50, leaving net income of $3,514.77. *See* Dkt. No. 16. However, this figure does not include payments on either the First Position or Second Position Liens. The

---

[10] Presumably, Debtors would have been able to disallow the First Position Lien claim and void the First Position Lien in a hypothetical Chapter 7 based on the same rationale on which they were able to obtain the Order Sustaining Claim Objection re: First Position Lien and Order Voiding First Position Lien in this case and adversary proceeding.

[11] This figure is the amount of Harbor West's original proof of claim. *See* Claim No. 2. The amount currently owed is explained in the declaration of Debtors' counsel at Docket No. 172.

Court has serious concerns regarding Debtors' ability to fund any feasible plan, especially considering that this case has been pending for nearly three years and the remaining plan term has been accordingly shortened. However, the Court has already concluded that the instant Plan is not confirmable. Thus, it is irrelevant whether this Plan is feasible.

## CONCLUSION

Debtors will be permitted to submit a tenth amended plan to remedy the barriers to confirmation as set forth in this Memorandum Opinion. Although the Court perceives no inherent prohibition against lien stripping in a Chapter 20 case, Debtors will not be able to resolve the problems set forth herein merely by treating the Second Position Lien holder as an unsecured creditor. This Plan's fundamental flaw is that it was not proposed in good faith. An Order Denying Confirmation of Debtors' Ninth Amended Plan will be entered accordingly.

**To be served on Debtors via the BNC.**